WIENER, Circuit Judge,
concurring:
I concur in the majority opinion, as I believe that it is a correct interpretation of 28 U.S.C. § 2255(h), but I write separately to emphasize the absurdity of its Kafkaesque result: Because Webster seeks to demonstrate only that he is constitutionally ineligible for the death penalty — and not that he is factually innocent of the crime— we must sanction his execution.
If the evidence that Webster attempts to introduce here were ever presented to a judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to be mentally retarded. In 1993 — more than a year before his indictment for the offense of conviction — Webster applied for Social Security benefits.[1] To determine his eligibility for those benefits, three separate government physicians performed medical and psychological examinations on him. Notably, all three physicians independently concluded that Webster is mentally retarded. First, Dr. Rittelmeyer diagnosed Webster as suffering from “[mjental retardation.” Then, Dr. Spellman described Webster as “a slow fellow who did not know much and did not know how to communicate well.” Explaining that he had found no evidence of exaggeration or malingering during his examination, Dr. Spellman concluded that Webster’s IQ was 69 or lower and that his significant cognitive difficulties were attributable not to mental illness but to “mental retardation.” Finally, Dr. Hackett performed an IQ test and concluded that Webster’s IQ was 59. Dr. Hackett described Webster as “mildly retarded,” “antisocial,” and unable to “function well in the work place.”
These reports, the merits of which have never been considered by any judge or jury, refute much of the evidence introduced by the government at the penalty phase of Webster’s trial. For example, *260 the government’s physicians — all of whom examined Webster while he was incarcerated for the offense of conviction — suggested that he was malingering and exaggerating his symptoms in the hopes of being found ineligible for the death penalty. In contrast, none of the Social Security physicians who diagnosed Webster’s mental retardation many years earlier noted any such evidence. Moreover, at trial, the government introduced testimony that Webster had never been placed in special education classes, which weighed further still against a finding of mental retardation. Again, though, the Social Security records tell a different story. Specifically, a letter to the Social Security Administration from Lou Jackson, the Special Education Supervisor for the Watson Chapel Schools, indicates that Webster was indeed enrolled in special education classes but that the records of his enrollment there were destroyed in 1988 after his family did not respond to a letter “telling them they could have the records if they wanted them.”[2] Under § 2255(h), however, we must turn a blind eye to this evidence, as it speaks to Webster’s constitutional eligibility for the death penalty and not his factual guilt or innocence of the crime.
The Supreme Court explained in Atkins v. Virginia that because mentally retarded persons suffer from “disabilities in areas of reasoning, judgment, and control of their impulses, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct.”[3] Thus, “in the light of our evolving standards of decency,” the Court held that the Eighth Amendment prohibits as excessive the execution of mentally retarded defendants.[4] Although I concur in the majority’s opinion as a correct statement of the law, I continue to harbor a deep and unsettling conviction that, albeit under Congress’s instruction which ties our judicial hands so illogically, we today have no choice but to condone just such an unconstitutional punishment.

. Although Webster's counsel requested these Social Security records long before his trial, they were only recently produced. And, when Webster sought additional discovery in connection with his first habeas petition, the district court denied his motion — just two days before the Supreme Court’s landmark decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) — and required that he file his petition within sixty days, i.e., less than two months after Atkins was decided and without the benefit of additional discovery.

. Of course, this is all in addition to the already substantial evidence of mental retardation that Webster introduced before the trial court, including, inter alia, testimony from Doctor Finn that Webster’s IQ was 59; testimony from Dr. Keyes that Webster had an IQ of 51 with the adaptive functioning of a seven-year-old; testimony from Dr. Cunning that Webster suffered from mild mental retardation; and testimony from several witnesses familiar with Webster's adaptive deficits in communication, conceptual skills, home living, functional academics, and day-to-day life.

. 536 U.S. at 320, 122 S.Ct. 2242 (emphasis added).

. Id.